19CA0768 Peo v Johnson 01-02-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 19CA0768
Arapahoe County District Court No. 18CR1540
Honorable Ben L. Leutwyler III, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Raeaje Resshaud Johnson,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE FREYRE
Lipinsky and Berger*, JJ., concur

Prior Opinion Announced October 13, 2022, Reversed in 22SC852

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced January 2, 2025

---

Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Tanja Heggins, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1     This case returns to us on remand from the supreme court in *People v. Johnson*, 2024 CO 35, and following a remand to the district court for step-three findings under *Batson v. Kentucky*, 476 U.S. 79 (1986).

¶ 2     Defendant, Raeaje Resshaud Johnson, appeals numerous convictions stemming from a domestic violence incident.  He challenges his convictions on four grounds and alleges that the trial court erroneously (1) denied his *Batson* challenge; (2) failed to instruct the jury on self-defense; and (3) permitted the prosecutor to engage in misconduct.[1]  Because none of Johnson's arguments warrant reversal, we affirm.

## I.     Background

¶ 3     Johnson and the victim were in a romantic relationship, despite an April 2018 protection order that precluded him from contacting her.  On May 19, 2018, the two made dinner plans for nine p.m. at the victim's apartment.  Johnson arrived late and intoxicated at one a.m.

---

[1] Johnson also challenged the admissibility of the generalized expert's testimony, and his challenge was rejected in *People v. Johnson*, 2022 COA 118, *rev'd on other grounds*, 2024 CO 35.

1

¶ 4     The victim let Johnson inside and angrily accused him of cheating on her. The argument became physical when the victim scratched and punched Johnson, and Johnson took her to the ground. The victim eventually pushed Johnson out of the apartment and closed and locked the door. They continued yelling through the door, while Johnson pounded on it. Ultimately, Johnson kicked the door open. He grabbed the victim, threw her to the floor, grabbed her by her hair, and threw her onto a couch. He then slapped her with an open hand. The victim scratched and bit Johnson to get away, fled the apartment, and called 911. She watched Johnson throw some of her personal property from her apartment's third floor balcony to the parking lot. Fearing Johnson would come to the parking lot, the victim drove Johnson's car from the parking lot and met the police at a nearby intersection.

¶ 5     The victim told the police about the altercation, but Johnson was gone by the time the officers reached the apartment. An officer encountered Johnson while en route to another call and arrested him. Johnson had the victim's keys at the time of arrest.

2

¶ 6     The People charged Johnson with first degree burglary, third degree assault, four counts of violation of a probation order, two counts of violation of bond conditions, witness tampering, and attempting to influence a public servant.  A jury acquitted him of attempting to influence a public servant but convicted him of the remaining charges.  The trial court sentenced him to three years in the custody of the Department of Corrections, followed by a four-year sentence to probation.[2]

## II.  *Batson* Challenge

¶ 7     Johnson first contends that the trial court erroneously denied his *Batson* challenge to Juror M, the only Black juror on the panel. He argues that the court erred at several points in *Batson*'s three-step inquiry for evaluating claims of racial discrimination in jury selection.  During the remand hearing, the trial court reviewed the record and issued a thorough written order containing step-

---

[2] Johnson also alleged that his sentence to probation following the completion of his Department of Corrections sentence was illegal. But this court granted his request for a limited remand, and the trial court corrected his sentence, so that issue is now moot.

three *Batson* findings.  Johnson contends that order insufficiently supports the court's ruling.  We are not persuaded.

## A.    Additional Facts

¶ 8    Before jury selection, all potential jurors completed a written questionnaire.  As relevant here, question number eight asked, "Have you, a member of your family, or a close friend had a particularly good or bad experience with a police officer?  If yes, describe."  Juror M responded, "Yes.  Many cases where cops are disrespectful due to certain racial identities."  Additionally, question number ten asked, "Do you believe there is any reason why you cannot be a fair and impartial juror?"  Juror M responded, "No. I would be great."

¶ 9    During voir dire, the prosecutor asked the jurors about alcohol use and its role in domestic violence.  One juror explained his belief that alcohol causes an intoxicated person to act like a different person than their sober self.  The prosecutor followed up by asking, "So, do you think that if you heard evidence that someone had assaulted another person, and that they were drunk when they did

it, . . . in your mind would that person be less responsible than if they were sober?" The juror responded no.

¶ 10 The prosecutor then asked Juror M the same question, and the following colloquy occurred:

> JUROR M: Just kind of what he said, as well because, you know, if domestic violence is still happening sober, and it just worsens when there is alcohol involved, they are both still responsible. Like, if it doesn't happen, and then there is alcohol involved now, that might — I don't know — trigger the domestic violence or whatever.
>
> PROSECUTOR: Okay. What if you were told that you were not going to know about anything in the past, and you had to look at what happened right here? Would that be difficult for you?
>
> JUROR M: Yeah, definitely.
>
> PROSECUTOR: Okay. So understanding we all want to know everything about the whole context, but . . . when it's a criminal trial, you get to hear about what happened on this day. Would you be able to look at something in isolation and not wonder or speculate about things that happened before if you were given the law that told you that you had to do it?
>
> JUROR M: I mean, I will definitely wonder, but I'll try to think of the present.

¶ 11    Neither the prosecutor nor defense counsel questioned Juror M about her responses to questions eight and ten on the questionnaire.

¶ 12    Later, the prosecutor used a peremptory strike to excuse Juror M, and defense counsel raised a *Batson* challenge:

> DEFENSE COUNSEL: Judge, I'm raising Batson as to [Juror M] . . . . [S]he is the only juror that was in the presumptive panel that looked to be of African-American in nature and ethnically speaking.
>
> Additionally, . . . I guess that I am alleging a case of racial prejudice and racial bias.
>
> PROSECTUOR: I guess as a threshold question this is tantamount to an accusation of picking jurors based on race.
>
> I think it is clear based on her questionnaire alone — [Juror M] talked about how law enforcement was disrespectful. She talked about how people of different races were treated differently in her experience with law enforcement. She also talked a lot about how she would want to know about the past, and it's a matter of wondering, and how the past is relevant in terms of talking about domestic violence. I think because of her answers in her questionnaire, there is more than enough reason for the People to have dismissed her.
>
> DEFENSE COUNSEL: I have [Juror M's] questionnaire in front of me. She says that she is a member of the Black Students

6

Alliance. She says that in her answer to question eight that there are many cases where police officers are disrespectful to certain people due to their racial identities.

It's clear, based on her questionnaire, that she's experienced racism in the past. I believe she's experiencing racism as a juror by taking her off this panel for Mr. Johnson, who is an African-American male.

I saw nothing she said to the [prosecutor] or to me during our jury selection that would indicate that she would not be fair to the Prosecution. It's quite the opposite. She actually mentioned things that would perhaps be prejudicial to Mr. Johnson, and that she understood why people would make things up in a domestic violence case.

She was agreeing with the woman who was sitting next to her, saying the same things, and that person just happens to not be African-American, so I am alleging a case of purposeful discrimination.

THE COURT: You said that she said the same things as a juror sitting right next to her?

I assume you are referring to Juror No. 5, and I don't recall at all, in terms of [Juror M's] comments about wanting to know what happened in the past.

So are there different statements that you are saying they had similar remarks regarding?

DEFENSE COUNSEL: Yes. So she was essentially saying that she was agreeing with

the juror next to her that . . . domestic violence cases are complicated, and that she would perhaps want to hear a broader picture of what happened.

And then instead of questioning her further and perhaps trying to establish a challenge for cause or something like that, [the prosecutor] actually said — but you know, you are okay with not knowing those things, and the juror, essentially agreed with her.

Based on what everybody else said, I don't think that there is — this juror stands out or she was saying anything negatively about [the prosecution's] case.

THE COURT: Follow-up from the People.

PROSECUTOR: Your honor, if the Court remembers at that point we were talking about when I made a caveat and explained the charges in this case — the evidence you are going to hear based only on the charges in this case, and you don't get to hear about what happened; and that's because it's about the charges here today, that was in response to [Juror M's] statement, and I asked her if that was going to be a problem for her, and she said that I would want to know about the past, and it's a matter of wondering, and that was in the context of wanting to know about how to assess credibility.

This is a domestic violence situation and whether or not the victim would be telling the truth in the context of two stories, one on the scene and one later, there was — the

motivation — the decision to dismiss this juror has nothing to do with race.

¶ 13     The trial court confirmed that Juror M was the only person among the first twenty-five jurors who appeared to be Black but then found, based on "the totality of the facts presented," that Johnson had not established a prima facie case of discrimination at step one.  Nevertheless, the court said that, even if a prima facie case had been established, the prosecutor satisfied her burden at step two by offering a race-neutral justification for the strike:

> THE COURT: My point is the People's offered explanation is race neutral, and that is that [Juror M] has experience with — in her perception, that law enforcement has, themselves, discriminated against people, based on their racial or ethnic identity, and this case clearly involves Mr. Johnson, an African-American man and law enforcement, and the fact that credibility of witness is always an issue, and you have law enforcement dealing with African-American citizens, raises the question for the Prosecution of whether she can be fair.
>
> Admittedly, her statement on the jury questionnaire later says she can be fair, but the People have offered an adequate race neutral reason for exercising that peremptory challenge.
>
> In that case, then, the third step the Court must go to is decide whether the opponent of

9

the strike has proved purposeful racial discrimination, and in that case, I cannot find that the Defense has met that burden.

So the Court will deny the challenge under Batson as to the peremptory challenge of [Juror M].

And then, with that, we will bring our jury back in.

PROSECUTOR: And, Your Honor, may I just briefly supplement the record?

THE COURT: Yes.

I'm sorry you mentioned, and I considered this in my decision, her answer regarding your questions that related to domestic violence, and she volunteered she would want to know about things that happened before.

I note that she ultimately said she would be able to follow the instruction that she might not know; that she would wonder, but she couldn't consider it.

But go ahead with your record.

PROSECUTOR: Thank you.

I have a couple of additional things. First, I want to note and importantly in this case, as this is a domestic violence case, and the named victim in this case in African-American. I think that is incredibly important.

The second thing I want to note, . . . [w]hen looking at my notes and making a decision, I am looking at the notes taken by my

co-counsel.  It was absolutely not readily apparent that [Juror M] was African-American, and I just want that to be supplemented on the record, because on appeal these types of observations are not necessarily apparent.

THE COURT: Thank you.

DEFENSE COUNSEL: And Judge, I'm sorry, I need to supplement that.

[Juror M] says that she is a member of the Black Students Alliance.  She identifies as black, obviously.  She looks black to me.  I spoke with my co-counsel, and he agreed with me.

For all intents and purposes, she appears to be African-American, and she also identifies that way, and so I object to any characterization that she is not — she could be of mixed race, and that is fair, but she clearly identifies as black.

Secondly, it is not a race neutral reason to cite racial discrimination and the fact that she has experienced it in the past as a reason to remove her from this panel.

¶ 14    On direct appeal, this division concluded that the prosecutor had offered both a race-neutral and race-based reason for the strike.  *People v. Johnson*, 2022 COA 118, ¶ 6 (*Johnson I*), *rev'd*, 2024 CO 35 (*Johnson II*).  To resolve whether the strike demonstrated purposeful discrimination, the division adopted a

11

"per se" approach. *Id.* at ¶ 7. Under this approach, "a racially discriminatory peremptory challenge in violation of *Batson* cannot be saved because the proponent of the strike puts forth a non-discriminatory reason." *People v. Ojeda*, 2019 COA 137M, ¶ 18 (quoting *State v. Shuler*, 545 S.E.2d 805, 811 (S.C. Ct. App. 2001)), *aff'd on other grounds*, 2022 CO 7. Using this approach, the division concluded that the trial court erred by denying Johnson's *Batson* challenge to the prosecutor's strike on Juror M, reversed his convictions, and remanded for a new trial. *Johnson I*, ¶ 1.

¶ 15     The supreme court granted the People's petition for certiorari and reversed the judgment, holding that, under step two of *Batson*, the prosecution's strike was race-neutral. *Johnson II*, ¶ 1. The supreme court determined that Juror M's description of past experiences with law enforcement was not an expression of a general distrust in law enforcement. *Id.* at ¶ 38. Moreover, however prevalent the distrust of law enforcement might be in some communities, the court concluded that such distrust is not an inherent characteristic of any race. *Id.* at ¶ 39. The supreme court also rejected the per se approach and held that the

12

substantial-motivating factor approach should be used in resolving the question of purposeful discrimination at step three. *Id.* at ¶ 57. Under the substantial-motivating factor approach a court will sustain a *Batson* challenge where the striking party was "motivated in substantial part by discriminatory intent." *Flowers v. Mississippi,* 588 U.S. 284, 303 (2019) (quoting *Foster v. Chatman,* 578 U.S. 488, 513 (2016)).

¶ 16　The supreme court remanded the case to this court to determine whether the domestic-violence explanation or the bias-against-law-enforcement explanation was the prosecutor's substantial motivating factor for striking Juror M and whether a remand to the trial court for further step-three findings was necessary. *Johnson II,* ¶ 63.

¶ 17　In conducting the step-three review on remand, the trial court first considered the prosecutor's demeanor. While the trial court noted the trial had occurred six years before and its recollection was incomplete, the court found that it was familiar with the lead prosecutor, having had numerous hearings and multiple trials with her. After reviewing the transcripts, the trial court found that the

prosecutor did not make any false statements, rely on inaccurate recollections, or make any unprofessional arguments. The court found that nothing about the prosecutor's demeanor supported a finding that the peremptory strike of Juror M was made with discriminatory intent.

¶ 18    Next, the trial court considered the reasonableness of the proffered race-neutral explanations. The court summarized the two reasons the prosecutor proffered: (1) Juror M's statement on her questionnaire regarding prior negative experiences with law enforcement and (2) her comments during voir dire expressing concern with her ability to assess the evidence without knowing about past events. The trial court found it was reasonable for the prosecution to draw the inference that Juror M's response on her questionnaire indicated that she would have a bias against law enforcement. And it found that a juror's acknowledgment that she would have difficulty in relying only on the evidence presented, without an explanation of prior events, provided a reasonable basis for the exercise of a peremptory strike.

¶ 19    The trial court then found that both proffered reasons were based on accepted trial strategy.

¶ 20    Next, the trial court considered similarly situated jurors. It found that, at the time of peremptory challenges, only two prospective jurors had indicated that they had a good or bad experience with law enforcement: Juror M and Juror 46. Juror 46 wrote, "[M]y brother who was intoxicated was thrown to the ground and broke knee cap." The defense struck Juror 46 after the prosecution accepted the panel with one strike remaining.

¶ 21    In finding that the prosecution's failure to strike Juror 46 did not lead to a conclusion of purposeful discrimination concerning Juror M, the trial court stated several possible inferences. The court reasoned that the prosecution might not have dismissed Juror 46 because Juror 46 described a single incident involving her brother and did not indicate a general distrust of or bias against law enforcement. It also reasoned that the prosecution might not have dismissed Juror 46 because "she was not a person of color and thus, her experience with law enforcement was not a factor for the prosecution."

15

¶ 22     Finally, the court considered disparate impact.  It acknowledged that Juror M was the only African American on the panel and that the prosecution struck her.  Nevertheless, it found that there was no evidence suggesting that the prosecutor was either overtly or covertly hostile to, or biased against, African Americans or other persons of color.  Additionally, it noted that three jurors with "traditionally Hispanic names" remained on the jury and that, because the victim was African American, the prosecutor had no reason to remove all African Americans from the jury.  Therefore, it found that the disparate impact did not evince purposeful discrimination by the prosecutor.

                    B.     Standard of Review and Applicable Law

¶ 23     The Equal Protection Clause of the Fourteenth Amendment precludes a juror challenge based on race.  *Batson*, 476 U.S. at 89.  "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure."  *Id.* at 86.

¶ 24     *Batson* provides a three-step process for evaluating claims of racial discrimination in jury selection.  *Johnson II*, ¶ 17; *People v.*

16

*Austin*, 2024 CO 36, ¶ 7.  First, the opponent of a peremptory strike must make a prima facie showing that the proponent used the strike against a potential juror because of race.  *Johnson II*, ¶ 18. As long as the totality of the relevant circumstances raises an inference of racial motivation, the objecting party has satisfied his or her step-one burden.  *Batson*, 476 U.S. at 96; *accord Valdez v. People*, 966 P.2d 587, 589 (Colo. 1998).  At step two, the proponent of the strike must offer a race-neutral explanation for the strike — an explanation based on something other than the race of the juror. *Johnson II*, ¶ 19.  The striking party may "provide any race-neutral justification for the strike, regardless of implausibility or persuasiveness."  *Ojeda*, ¶ 24.

¶ 25    The trial court's task at step three of a *Batson* analysis is to determine whether the objecting party proved that the striking party exercised peremptory challenges with discriminatory animus. *People v. Rodriguez*, 2015 CO 55, ¶ 12.  The decisive question at step three is whether counsel's race-neutral explanation should be believed.  *People v. Collins*, 187 P.3d 1178, 1182 (Colo. App. 2008). "In assessing the credibility of the proponent of the strike, the court

17

may consider a number of factors, including the proponent's demeanor, how reasonable or improbable the proponent's explanations are, and whether the proffered rationale has some basis in accepted trial strategy." *Id.* The ultimate burden of persuasion rests with the opponent of the strike, *Purkett v. Elem,* 514 U.S. 765, 767 (1995), and, for a *Batson* challenge to succeed, the court must "find by a preponderance of the evidence that one or more potential jurors were excluded because of race," *Valdez,* 966 P.2d at 590.

¶ 26 Different steps of the *Batson* analysis are subject to separate standards of review. *Ojeda,* ¶ 30. We review steps one and two de novo. *Id.* At step three, the trial court's final determination as to the existence of racial discrimination is an issue of fact that we review for clear error. *Id.*; *see also Snyder v. Louisiana,* 552 U.S. 472, 477 (2008) ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous."); *Batson,* 476 U.S. at 98 n.21 ("Since the trial judge's findings in the context under consideration [at step three] largely will turn on evaluation of credibility, a reviewing court ordinarily

18

should give those findings great deference.").  We defer to the trial court's three-step ruling "so long as the record reflects that the trial court weighed all of the pertinent circumstances and supports the court's conclusion" regarding purposeful discrimination.  *Ojeda,* ¶ 42 (quoting *People v. Beauvais*, 2017 CO 34, ¶ 32).

### C.    Analysis

¶ 27    We first conclude that any decision that was made at step one is moot because the trial court proceeded to steps two and three. *See People v. Gabler*, 958 P.2d 505, 508 (Colo. App. 1997).

¶ 28    Next, we conclude, consistent with the supreme court's decision, that the prosecution offered race-neutral reasons for the strike at step two.  *See Johnson II*, ¶ 1.

¶ 29    Regarding step three, we discern no clear error and conclude that the record supports the trial court's findings.  The court considered the prosecutor's demeanor, the reasonableness of the proffered race-neutral explanations, whether the proffered rationale was based in trial strategy, similarly situated jurors, and the disparate impact of the strike.  The court made thorough findings, and those findings are supported by the record.

19

¶ 30     We reject Johnson's assertion that the prosecutor's

defensiveness regarding the *Batson* challenge suggests that the

prosecutor's peremptory strike of Juror M was motivated by

discriminatory intent.  The trial court determined that nothing

about the prosecutor's demeanor showed the peremptory strike was

made with discriminatory intent.  We give great deference to the

trial court's credibility findings.  *Batson*, 476 U.S. at 98 n.21.

¶ 31     We also reject Johnson's assertion that the prosecutor's failure

to question Juror M about question number eight of the

questionnaire suggests pretext and purposeful discrimination.  The

trial court found the bias inference reasonable and noted that

neither attorney questioned Juror M concerning her response, nor

did they question Juror 46, who was also excused from the panel.

Because the record supports the court's analysis, we must affirm it.

¶ 32     Finally, we are not convinced that the trial court's comparative

juror analysis was improper because the two jurors the court

compared were not similarly situated.  The court acknowledged the

lack of similarity and found that the inferences it could draw from

such a comparison were too speculative to consider and not

supported by the record. In the end, the court found that the defense had not met its burden of showing that the prosecution's failure to strike Juror 46 was pretextual.

¶ 33    Accordingly, we discern no clear error in the court's step-three analysis and affirm its decision denying Johnson's *Batson* challenge.

## III.    Jury Instruction

¶ 34    Johnson next contends the trial court erroneously denied his self-defense instruction because the record contains a scintilla of evidence to support it. We disagree.

## A.    Additional Facts

¶ 35    During the jury instruction conference, Johnson argued that the altercation between him and the victim was a continuous physical altercation in which the victim was the initial aggressor and, thus, that he was entitled to a self-defense instruction on the burglary charges. The trial court disagreed and found that self-defense did not apply to the burglary charges. The court stated:

> I find that self-defense does not apply to
> second degree — or first degree burglary under
> these facts. I think I could conceive of a set of

facts where it does. But here, really the uncontroverted evidence is that after what is an arguably lawful entry, Mr. Johnson is then forced out of the home, and he kicks the door in, re-enters, and at that point, commits either first or second-degree burglary, based on the evidence.

And in that case, or rather under those facts, I just don't see even a scintilla of evidence of self-defense to first-degree burglary. I think it is — it is arguable if the first-degree burglary or second-degree burglary was a result of the initial contact where [the victim] says she was an aggressor. But those aren't the facts here.

So I think frankly, if the — well hold on for a moment. I'll give an instruction on self-defense as it relates to third-degree assault, but not as to first and second-degree burglary based on the facts that we have here.

¶ 36     Subsequently, the following colloquy occurred:

THE COURT: The only way to do this — and I think I've said this a number of times — is to accept the Defense theory that it's one continuous episode. And I — I don't think that — that that is the case here, because there is a — there's a demarcation of the incident that occurs before Mr. Johnson is forced out of the residence and the door is closed. And I don't think there's any argument that the door wasn't closed because he kicked in the door, damaging the door and the — the locks that we saw in the photographs.

And so at that point — which goes back to there's no self-defense to first degree or second

22

degree burglary, the third degree assault occurs after the unlawful entry, and there's no evidence of self-defense at that point. There's no evidence of unlawful physical force used by [the victim].

DEFENSE COUNSEL: And [the victim] did say that she was going crazy and that she was slapping him with her open hand — no, actually I think she said she punched him.

THE COURT: Okay.

DEFENSE COUNSEL: — after that entry, during — an — during this physical altercation that lasted — or started before the incident at the door.

THE COURT: So after he kicked the door in, evidence that he had to restrain her based on her actions?

DEFENSE COUNSEL: Based on what she was saying — based on her actions. Right.

¶ 37    The jury found Johnson guilty of first degree burglary and that Johnson committed first degree burglary with the intent to commit violation of a protection order.

B.    Standard of Review and Applicable Law

¶ 38    A trial court has a duty to correctly instruct the jury on the applicable law. *Castillo v. People*, 2018 CO 62, ¶ 34. We review a trial court's decision whether to give or reject a jury instruction for

23

an abuse of discretion.  *Kinney v. People*, 187 P.3d 548, 558 (Colo. 2008).  A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or is based on an erroneous understanding or application of the law.  *People v. Esparza-Treto*, 282 P.3d 471, 480 (Colo. App. 2011).

¶ 39    An affirmative defense seeks to "justify, excuse, or mitigate the commission of the act."  *People v. Wakefield*, 2018 COA 37, ¶ 9.  If there is some evidence to support the argument that the defendant acted in self-defense, the court must give a self-defense instruction. *Id.* at ¶ 20.  The "some credible evidence" standard — sometimes referred to as the "some evidence," "any credible [even if highly improbable] evidence," "a scintilla of evidence," "a small quantum of evidence," and "any evidence standard," *Galvan v. People*, 2020 CO 82, ¶ 24 (citations omitted) — is "'exceedingly low' making [the] preclusion of an affirmative defense appropriate only when there is 'simply no evidence . . . in th[e] record'" to support it, *People v. Jacobson*, 2017 COA 92, ¶ 15 (quoting *People v. Platt*, 170 P.3d 802, 806 (Colo. App. 2007)).

¶ 40 "[A] person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose." § 18-1-704(1), C.R.S. 2024.

> A person commits first degree burglary if the person knowingly enters unlawfully, or remains unlawfully after a lawful or unlawful entry, in a building or occupied structure with intent to commit therein a crime . . . against another person or property, and if in effecting entry or while in the building or occupied structure or in immediate flight therefrom, the person or another participant in the crime assaults or menaces any person . . . .

§ 18-4-202(1), C.R.S. 2024.

## C.    Analysis

¶ 41 Johnson reasons that he was entitled to a self-defense instruction because the victim testified that, once Johnson re-entered the apartment, she scratched, punched, and bit him. The victim testified that Johnson was reacting to her physical contact. We discern no abuse of discretion in the court's decision to reject a self-defense instruction.

25

¶ 42      On the night of the incident, the victim told police that Johnson kicked in the door to her apartment, came in, assaulted her, and took some keys from her purse.  She stated that, when Johnson entered the apartment, he grabbed her by the hair, called her a derogatory name, and threw her on the ground.  Then he picked her up and threw her on the couch.

¶ 43      At trial, the victim testified that, after a physical altercation in her apartment, she was able to shove Johnson out of the door.  She said she yelled at him through the door, they argued through the door, and then he kicked the door down.  When he re-entered the apartment, he brought her back down to the floor while she scratched and bit him and eventually got away.

¶ 44      We conclude that, under both descriptions, there is insufficient evidence to support a self-defense instruction for the burglary charges.  While the victim testified that she and Johnson were in a physical altercation before she was able to shove him out of the apartment, once outside the apartment, Johnson was no longer vulnerable to the victim's attack and thus, could not reasonably believe he faced a risk of imminent use of unlawful

physical force by her. Johnson does not identify, nor do we see in the record, any evidence to show that Johnson re-entered the apartment to defend himself. Moreover, Johnson's re-entry constitutes evidence that he was the initial aggressor in the second altercation and that the victim's actions of biting and scratching were reactions to his unlawful entry. *See* § 18-1-704(3)(b); *see People v. Zukowski*, 260 P.3d 339, 247 (Colo. App. 2010) (a person's right to self-defense is abridged when he is the initial aggressor).

¶ 45 Accordingly, because no credible evidence supported a self-defense instruction, the court did not err by refusing to give one.

## IV. Prosecutorial Misconduct

¶ 46 Johnson contends that the prosecutor engaged in misconduct in both closing and rebuttal closing argument. We disagree.

### A. Additional Facts

¶ 47 The complaint alleged that Johnson committed burglary "with the intent to commit therein the crime of Assault in the Third Degree or Violation of a Criminal Protection Order." The burglary verdict form required the jurors to indicate whether the burglary was committed "with the intent to commit" a violation of a

protection order, third degree assault, or both. Jury Instruction No. 12 defined "with intent" by noting that "a person acts with intent when his conscious objective is to cause the specific result proscribed by the statute defining the offense. It is immaterial to the issue of specific intent whether or not the result actually occurred."

¶ 48     Jury Instruction No. 14 provided the elements of first degree burglary:

> 1. That Mr. Johnson,
>
> 2. in the state of Colorado, at or about the date and place charged,
>
> 3. knowingly,
>
> 4. entered unlawfully, or remined unlawfully after a lawful entry,
>
> 5. in a building or occupied structure,
>
> 6. with intent,
>
> 7. to commit therein the crimes of Violation of a Protection Order or Assault in the Third Degree, against another person or property, and
>
> 8. in effecting entry or while in the building or occupied structure or in immediate flight from the building or occupied structure,

28

9. The defendant committed the crime of Assault in the Third Degree against another person.

¶ 49 During closing argument, the prosecutor repeatedly argued that the burglary counts required proof that Johnson knowingly entered unlawfully into a building or occupied structure with the intent to commit a particular crime.

¶ 50 Specifically, the prosecutor argued:

> [L]et's look at element four enter unlawfully. What does enter unlawfully mean? It means when someone goes to someone's house without the privilege to do so when there is a law, when there is a protection order that says you can't go there, you don't have the privilege to do so.
>
> DEFENSE COUNSEL: I object, Your Honor. [The prosecutor is] presenting two different rules. There is no rule saying that.
>
> THE COURT: Overruled.
>
> . . . .
>
> PROSECUTOR: Now, there is an instruction that you're going to read. It's [a] unanimity instruction. Leave it to lawyers to make it complicated; right? What that means, if you can — as you can recall, in first and second degree burglary, there are elements that have to be met with intent to commit a crime of either the violation of protection order or assault; right? But you all have to agree on

whether it's a violation of protection order, assault, or both.

Let me give you scenarios. For example, let's say you are in the deliberation room. All jurors believe that an assault occurred or that he went in there to commit an assault. That is guilty. You don't even have to assess the violation of the protection order. Let's do another scenario. All jurors believe that a violation of protection order occurred. That is guilty.

DEFENSE COUNSEL: I object, Your Honor. It's specific intent not whether the assault actually occurred.

THE COURT: Overruled.

DEFENSE COUNSEL: May we approach?

THE COURT: No.

DEFENSE COUNSEL: It's just not accurate.

THE COURT: Ladies and gentlemen, you have the instructions. I read the instructions, and this is the closing. You may proceed.

PROSECUTOR: If the violation of protection order elements have been met and you believe he went in there with the intent to break that protection order, then that is guilty. That's another scenario. If you all agree that both things happened, that is also guilty.

The only thing we can't have is a scenario like this. Let's say six of you say I think he went in there to commit an assault or I think he assaulted her, but I don't see a protection

order; and the other six are saying I don't think the assault happened, but I see the protection order, then it's not guilty on burglary. But if all 12 of you agree that the violation of the protection order happened or an assault or both, that's guilty. Hopefully that makes sense.

We know that first degree burglary occurred, and if you don't believe that there was an assault, at the very least we know a second degree occurred because he broke in and violated a protection order.

DEFENSE COUNSEL: I object, Your Honor. It's still not the law. It's specific intent.

THE COURT: Ladies and gentlemen, you follow the instructions that I gave you that define the elements of each crime. You may proceed.

¶ 51    During Johnson's closing, counsel repeatedly accused the prosecutors of improperly targeting Johnson for prosecution stating,

Ladies and gentlemen, I want you to think about the nature of the charges and think about what's really happening here. What this case is, is the People of the State of Colorado against this man right here, Raeaje Johnson. And the People, the government is taking this personally because according to them Mr. Johnson continues to contact [the victim] with her consent.

¶ 52    Counsel further argued, "They are asking you to make so many assumptions about this complicated, messy relationship because they feel like they were personally affected by this case."

¶ 53    Counsel continued:

> And the jail calls bring me back to another point that I made, and this is part of the reason why the government is so aggressively prosecuting Mr. Johnson.  Do not talk to the [prosecutor].  The [prosecutor] is against me.  Only talk to my public defender.
>
> Isn't the [prosecutor] against him?  Hasn't this whole trial been about how the [prosecutor]'s against him?  Not only that, but they are trying to make [the victim] into something she's not.  They are trying to manipulate what happened because they are mad at Mr. Johnson because he keeps violating a protection order, according to them . . .  And the only reason you heard that was because they have a personal stake in what's happening.

¶ 54    The prosecutor responded in rebuttal:

> The defense talked a lot about these jail calls and how we only played certain portions of them.  And, yeah, we have the burden as the People.  But you are going to get an instruction that even says that [the] redactions were agreed upon.  And you heard that there were close to a thousand jail calls.  These are the calls where the defendant's committed a crime.  And simply because he committed a crime and he is being prosecuted does not mean that everyone is out to get him.  It doesn't mean

that the government's targeting him.  It means that we have an ethical duty.

DEFENSE COUNSEL: I object, Your Honor, on commenting on ethical duties.

THE COURT: Overruled.

DEFENSE COUNSEL: I think that's posturing.

THE COURT: Overruled.

DEFENSE COUNSEL: And —

THE COURT: Overruled.  You may proceed.

 . . . .

DEFENSE COUNSEL: Judge, I object to [the prosecutor] saying that she has an ethical obligation in prosecution of people.  It's posturing, number one.  Number two, it's cloaking — it's the [prosecution] cloaking themselves in the authority of the state and in order to essentially make an argument to the jury that they should be believed more than someone else.  It is objectionable.  I think the Court should have granted my objection and — I guess — that's my record.  So I feel that argument violates Mr. Johnson's right to a fair trial under the United States and Colorado Constitution to due process under the Colorado and United States constitution.

THE COURT: Thank you.  My finding regarding that was that the defense argument that the People were doing this because they had a personal stake was objectionable.  [The prosecutor] didn't object and so I didn't make any ruling on it.  Once that argument was

33

made particularly more than once as it happened here, then I found that the [prosecutor]'s response that they have an ethical duty to prosecute cases was an appropriate response.

They did not make comment that they believed [the victim], that they believed any particular witness, or that they believed any particular fact. So I don't find that there was any — anything improper in that responsive argument, and so that's why I overruled the defense's objection

DEFENSE COUNSEL: I understand the Court's ruling. It's just that just because something is objectionable doesn't mean that they can do it in response to one of my arguments.

THE COURT: I disagree. They have the right to respond to arguments. That is what rebuttal argument is.

DEFENSE COUNSEL: I am a defense attorney. I am not a [prosecutor]. I have certain ethical obligations to defend my client to the full extent of the law, and that does not open the door to the [prosecution] cloaking themselves in authority and asking the jury to believe them because of that authority and ethical obligation.

THE COURT: I don't believe that's what they did. But in fact what I find is that their response was exactly to that from the defense, that the defense cloaked the [prosecutor] in the authority of the State and then further said they have a personal stake in this, they are taking it personally. So whether they objected

34

to it or not does not matter. What matters is that they made a fair response to an argument made by the defense. However your record is made.

### B. Standard of Review and Applicable Law

¶ 55 "Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion." *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005). We will not disturb the trial court's rulings regarding such a statement absent a showing of abuse of discretion. *People v. Strock*, 252 P.3d 1148, 1152 (Colo. App. 2010). A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or is based on a misunderstanding or misapplication of the law. *People v. Snelling*, 2022 COA 116M, ¶ 31.

¶ 56 We conduct a two-step analysis when reviewing claims of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine "whether the prosecutor's questionable conduct was improper based on the totality of the circumstances." *Id.* In doing so, we consider the context of the argument as a whole and view it in the light of the evidence before the jury. *People v. Samson*, 2012 COA 167, ¶ 30.

35

¶ 57　　The prosecution has wide latitude to make arguments based on facts in evidence and the reasonable inferences that can be drawn from those facts. *Strock,* 252 P.3d at 1153. The prosecution is permitted to use rhetorical devices and engage in oratorical embellishment. *Samson,* ¶ 31. Because arguments delivered in the heat of trial are not always perfectly scripted, we give the prosecution the benefit of the doubt when their remarks are ambiguous or simply inartful. *Id.* at ¶ 30. However, closing arguments cannot be used to mislead or unduly influence the jury. *Domingo-Gomez,* 125 P.3d at 1048-50. To that end, the prosecution may not intentionally misstate the evidence or law, attempt to inflame the juror's passions or prejudices, or offer a personal opinion as to the defendant's guilt. *Id.* at 1049; *see also People v. Maloy,* 2020 COA 71, ¶ 61.

¶ 58　　Second, if the comments were improper, we determine "whether such actions warrant reversal according to the proper standard of review." *Wend,* 235 P.3d at 1096.

36

## C.    Analysis

### 1.    Closing Argument

¶ 59    Johnson contends that the prosecutor misstated the law concerning the "with intent" requirement. We are not persuaded.

¶ 60    The prosecutor began with a description of unanimity and properly explained that the jury had to agree on whether there was an intent to commit violation of a protection order, third degree assault, or both to find Johnson guilty of first degree burglary. In doing so, the prosecutor argued, "[T]here are elements that have to be met with intent to commit a crime of either the violation or protection order or assault." The prosecutor then moved on to a series of scenarios in which the jury could find Johnson guilty or not guilty. In these scenarios the prosecutor referred to the two possible offenses without the words "with intent." While the prosecutor's phrasing might have been inartful, we note that "arguments delivered in the heat of trial are not always perfectly scripted." *People v. Magana,* 2020 COA 148, ¶ 22, *aff'd in part and rev'd in part,* 2022 CO 25. Accordingly, we give the prosecution the "benefit of the doubt when their remarks are ambiguous or simply inartful." *Id.* (quoting *People v. McMinn,* 2013 COA 94, ¶ 60).

¶ 61    However, even if the prosecutor's statements amounted to misconduct, any error is harmless.  After each objection, the trial court referred the jury to the instructions, which accurately stated the law.  *See id.* at ¶ 26 (alleged misstatement of the law, if error, was harmless where comment was isolated, and jurors were given instructions that accurately stated the law); *Galvan*, ¶ 29 (a jury is presumed to follow a trial court's instructions).

## 2.    Rebuttal Argument

¶ 62    Johnson contends the prosecutor's argument that she had an ethical obligation to bring charges was improper.  We disagree.

¶ 63    The prosecutor's comments were a direct response to Johnson's argument that the prosecution was improperly targeting him and taking the charges "personally."  *See People v. Wallace*, 97 P.3d 262, 269 (Colo. App. 2004) ("A prosecutor is afforded considerable latitude in replying to an argument by defense counsel.").

¶ 64    Moreover, Johnson's reliance on *Domingo-Gomez* is misplaced.  In *Domingo-Gomez,* the prosecutor referred to a screening process that Domingo-Gomez's case went through before trial.  125 P.3d at

1052.  The supreme court found that this reference to a screening process was improper because "it both hints that additional evidence supporting guilt exists and reveals the personal opinion of the prosecutor."  *Id.*  Here, the prosecutor's comments did not allude to any additional evidence, nor did they profess the prosecutor's personal opinion.  As previously stated, the statement was merely a response to Johnson's closing argument.  Accordingly, we discern no prosecutorial misconduct.

## V.    Disposition

¶ 65    The judgment is affirmed.

JUDGE LIPINSKY and JUDGE BERGER concur.